IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHAEL TILLERY,                    )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )    1:15-cv-01256 (LMB/IDD)
                                    )
PIEDMONT AIRLINES, INC.,            )
                                    )
        Defendant.                  )

MEMORANDUM OPINION

Plaintiff Michael Tillery ("plaintiff" or "Tillery"), a 66-year-old African American male,

filed this six-count[1] civil action against Piedmont Airlines, Inc. ("Piedmont" or "defendant"),

alleging in Count I Age Discrimination under the Age Discrimination in Employment Act

(ADEA); in Count II a hostile work environment under the ADEA; in Count III retaliation for

engaging in protected Title VII activity; in Count IV discrimination on the basis of race in

violation of 42 U.S.C. § 1981; in Count V a hostile work environment under § 1981; and in

Count VI retaliation for engaging in protected § 1981 activity.

Before the Court is defendant's Motion for Summary Judgment, to which plaintiff has

responded and on which oral argument has been heard. For the reasons that follow, defendant's

motion will be granted on all counts.

---

[1] The complaint originally included a seventh count, alleging sex discrimination, which plaintiff
has withdrawn.

## I. BACKGROUND

Piedmont hired plaintiff in 2006, when plaintiff was 57 years old, and fired him on March 19, 2014.[2]  Def. Uncontested Facts, [Dkt. 35] ¶¶ 1, 41.[3]  When he was fired, Tillery was a ground control agent at Ronald Reagan Washington National Airport (DCA), a position that included directing planes during taxiing and keeping records.  Def. Uncontested Facts at ¶¶ 1, 2. According to Tillery, the job environment was "busy [and] stressful."  Tillery Dep., [Dkt. 35-1] at 198:14.  Shifts lasted 10 hours, and ground control agents had "information coming to [them] from practically everybody."  Tillery Dep., [Dkt. 35-1] at 198:15–19.

While employed by Piedmont, Tillery took an active role in the union representing ground crew workers.  Beginning in 2012, Tillery served as vice-president of the union local. Tillery Dep., [Dkt. 35-1] at 54:11–13.  Through his union work, Tillery raised frequent complaints about diverse subjects, including contract disputes and safety complaints.  Def. Uncontested Facts ¶ 7.  From 2011 to 2012, Tillery assisted three female employees alleging sexual harassment against Vincent Chambers, a ramp manager, and traveled with one of those employees to the Equal Employment Opportunity Commission (EEOC) offices in Washington, D.C., to help her file a complaint.  Tillery Dep., [Dkt. 35-1] at 248:10–249:21; 85:11–86:19. Piedmont fired Chambers in August 2012.  Def. Uncontested Facts ¶ 8 & n.3.  Tillery alleges that Chambers "threaten[ed] him" at some point "around Summer 2013,"[4] saying "Piedmont

---

[2] Other documents put the termination date on March 18 or 20, but March 19 appears most consistently and lines up with the facts as described in other parts of the record.

[3] Although the Court could have, it did not accept all of defendant's Uncontested Facts as conceded by plaintiff because, in violation of Local Civil Rule 56, plaintiff did not include his list of uncontested facts or object to defendant's within his opposition memorandum, instead appending them as an exhibit.

[4] This date would appear to be wrong because Chambers was fired in August 2012.  See Def. Uncontested Facts ¶ 8 & n.3.

Airlines cannot afford to fire me because I know dirt on all of them. We will get you first, if not I would see to it personally. Nobody at Piedmont Airlines likes you now, because you encourage other employees to file claims against management at the EEOC." Tillery Aff., [Dkt. 41-15] ¶ 13.

According to Tillery, Piedmont's regional and administrative manager, Lisa High, also repeatedly expressed frustration over the role that he played in these sexual harassment proceedings, as well as his union activity more generally. In an affidavit, a former Piedmont colleague, Eugene Howard, averred that at a "manager's meeting" sometime after the "Winter 2013," High said "Piedmont Airlines should simply retire Mike, before the other black employees openly questioned [sic] Piedmont airlines [sic] about their practices, their policies under the handbook and/or begin to assert their union, employment law or civil rights against Piedmont." [Dkt. 41-3] ¶ 2. In another affidavit, former Piedmont employee, Richard Gordon, stated that "[f]or the entire periods [sic] of 2012–2013, Tillery's name would continually be brought up by Lisa High . . . . [High said that] Tillery was causing trouble again by advocating for Piedmont employees at union grievance hearings or with the EEOC." [Dkt. 41-4] ¶ 14.[5]

Tillery alleges that aside from negative comments about his union activity, several employees made unwelcome comments about his age, race, or both during his time at Piedmont. With respect to age, at a minimum, manager Kenya Jones, an African-American, regularly referred to Tillery as "Granddad" (or, less frequently, "grandpa"). Def. Uncontested Facts ¶ 14; Ans. [Dkt. 22] ¶¶ 31–32. According to Howard's affidavit, High, who is 48 years old, and other unnamed Piedmont managers made similar remarks at meetings that Tillery did not attend.

---

[5] High denies making both remarks, see High Dep., [Dkt. 41-2] at 21:3–25:20, but for the purposes of defendant's motion for summary judgment the evidence must be viewed in the plaintiff's favor.

[Dkt. 41-3] at ¶¶ 4, 9.[6]  Piedmont employees generally understood "Granddad" to refer to an African-American character called "Granddad" in The Boondocks, a comic strip and televised animated series.  Ans. ¶ 31.  Jones regularly performed a dance popularized by Granddad from The Boondocks when speaking about Tillery in his presence.  Tillery Aff., [Dkt. 35-1] at 215:6–22.

Beyond the comparison to The Boondocks character, Tillery makes only one allegation of a racially charged comment, although his description of that comment has changed over time. In his First Amended Complaint, Tillery alleged that Danyelle Montivego, his immediate supervisor at the time, relayed to him a statement made by an unnamed member of management that "some of the younger black employees would follow 'grandpa's [Tillery's] lead' because 'monkey see, monkey do.'"  First Amd. Compl., [Dkt. 15] ¶ 28.  During Tillery's deposition he was not directly asked about the "monkey see, monkey do" comment; however, when defense counsel asked plaintiff whether Montivego had ever said anything racially offensive to his face, Tillery did not mention the "monkey see, monkey do" comment.  See [Dkt. 35-1] at 214:14–19.[7] Nearly three months later, in an affidavit executed the day before his opposition to defendant's Motion for Summary Judgment was filed, Tillery asserted that it was Michelle Roper, another supervisor, who relayed the "monkey see, monkey do" comment to him, and specifically attributed the comment to Louden.  [Dkt. 41-15] ¶ 19.  In the affidavit version, Tillery also recalled a statement considerably more profane than the one described in the First Amended Complaint, this time alleging that Louden, who is African-American, said he "was not going to let the union run this station . . . this is just some nigger shit, monkey see, monkey do shit that Michael is doing."  [Dkt. 41-15] ¶ 19.

---

[6] High also denies making these remarks.  High Dep., [Dkt. 41-2] at 24:15–21.

[7] Neither party asked Tillery whether Montivego relayed or repeated any offensive comments.

Tillery's account of whether he complained about these comments has changed over time.  In his deposition, he claimed that he challenged Jones' use of "Granddad" by asking "on a regular basis, [w]hat, you don't know my name[,]" [Dkt. 35-1] at 217:19–20.  Although he "didn't like" the name, he admitted that he was "not necessarily offended" by it and that "his feelings were not hurt."  [Dkt. 35-1] at 218:17–219:4.  He claimed that Jones "was in a batch of managers that [he] complained to [Louden] about," [Dkt. 35-1] at 224:21–22, but admitted that he could not recall speaking about the age-related comments with Louden.  [Dkt. 35-1] at 230:5–7.  On the other hand, in his post-deposition affidavit, Tillery contends that he "told Louden that [Jones'] remarks were hurtful and offensive and that it effected [sic] my concentration at work," but Louden "brushed aside" these concerns.  [Dkt. 41-15] ¶ 24.

Tillery has not alleged that he reported the "monkey see, monkey do" comment to anyone, although he does claim that he had a conversation with Louden about race discrimination at Piedmont.  See Tillery Dep., [Dkt. 41-1] at 228:4.  When asked at his deposition whether he "ever actually [told Louden] that [he] believed there was race discrimination going on," Tillery did not provide a direct answer; instead, he replied "I would say—I would say yes.  But then it would be specific to individuals, individuals.  Like it would be specific to what an individual had told me.  And if more than one person told me, I would say we have an incidence of where we need to—we need to put a stop to it or curtail it." [Dkt. 41-1] at 228:1–9.  Tillery could not remember the names of any of those employees, and when he was asked if he ever complained that he was personally treated unfairly because of race, his answer was: "Yeah.  We—we talked about race and the fact that we were firing quite a few African-descent individuals, and we were hiring quite a few.  So it would stand to reason, but—that since there were more of them, that we were—and there was more of them going out the door.  So we

had a conversation about that. We had a conversation about race." [Dkt 41-1] at 229:4–13.
Tillery does not remember anything else about this conversation, including when it took place.
[Dkt. 41-1] at 229:14–22.

Piedmont's contemporaneous records show that it disciplined Tillery at least fourteen
times between 2006 and January 2013. Def. Uncontested Facts ¶ 18. It is uncontested that
defendant "follows a progressive disciplinary system, and looks to disciplinary incidents over a
rolling twelve month period in making decisions on further discipline or discharge." Foose Aff.,
[Dkt. 35-9] ¶ 11. When an employee is disciplined, Piedmont creates a written form
documenting the incident, which includes a list of all the employee's documented incidents over
the preceding twelve months. Foose Aff., [Dkt. 35-9] ¶ 11. Infractions are rated on a scale from
the least serious, level 1, to the most serious, level 3, a scale that Tillery testified he understood.
Tillery Dep., [Dkt. 41-1] at 125:9–10. The incidents involving Tillery from 2006 to January
2013 ranged from level 1 to level 3 infractions, and included insubordination, failures to follow
procedures, chronic tardiness, and failures to complete required training. Tillery Dep., [Dkt. 41-
1] at 125:9–10.[8]

Of significance to this case are Tillery's personnel records, which document six
infractions in the twelve months leading up to his termination. Def. Uncontested Facts ¶ 20.
The first, a level 1 infraction, occurred on April 18, 2013, when Tillery refused "to sign briefings
[containing] important information about updates or safety issues in DCA." Tillery Dep., [Dkt.
35-1] Ex. 31. Tillery did not sign the disciplinary notice at the time and did not recall the
incident at his deposition. Tillery Dep., [Dkt. 35-1] at 149:18–20. The second incident, a level 3

---

[8] On several occasions, Tillery refused to sign the documentation, did not recall the matter, or
unsuccessfully grieved these incidents. Tillery Dep., [Dkt. 35-1] at 118:12–137:11. He called
two of the incidents "implausible." Tillery Dep., [Dkt. 35-1] at 139:10–140:15.

violation, occurred on April 25, 2013. As Tillery recalls, after Piedmont refused a request by

Tillery for unscheduled time off, he called out sick, which Piedmont considers an "abuse" of its

sick leave policy. Tillery Dep., [Dkt. 35-1] Ex. 32. Tillery signed the form, and noted that he

was going to appeal, Tillery Dep., [Dkt. 35-1] at 151:9–152:21, but there is no evidence of any

appeal in the record.

The third incident during that twelve month period took place on May 18, 2013, when

Tillery twice failed to keep accurate gate records. Tillery Dep., [Dkt. 35-1] Ex. 33. The two

failures together constituted a level 2 infraction. Tillery Dep., [Dkt. 35-1] Ex. 33. Tillery

unsuccessfully grieved this finding. Tillery Dep., [Dkt. 35-1] at 155:4–156:14. The fourth

incident, a level 3, was documented on November 5, 2013, for Tillery's failure to complete

online training by the October 31, 2013, deadline. Tillery Dep., [Dkt. 35-1] Ex. 34. In his

deposition, Tillery testified, without supporting documentation, that he completed the training,

but equivocated when asked whether he thought Piedmont's records were wrong. Tillery Dep.,

[Dkt. 35-1] at 159:16–160:3.[9]

The fifth disciplinary action occurred on January 31, 2014. Tillery Dep., [Dkt. 35-1]

Ex. 35. Management had put certain union workers on mandatory overtime using a procedure

that Tillery felt violated the collective bargaining agreement. Tillery Dep., [Dkt. 35-1] Ex. 35.

Tillery began to object to the overtime arrangement by complaining about it over the radio used

for work communications. Tillery Dep., [Dkt. 35-1] Ex. 35. After being asked to stop using the

radio for that purpose, Tillery "refused to comply and became argumentative, still over the

radio." Tillery Dep., [Dkt. 35-1] Ex. 35. When Jones told Tillery he needed to follow the

[9] "Q: So was it your position that there was some sort of a computer error not showing that you
had completed the training?

A: Yes. I mean, I would—yeah, I would—I'm not sure. But, yes, I would say there was no
print—there wasn't a printout. And I guess it showed incomplete."

grievance process, Tillery "became argumentative . . . disturbing everyone in operations." Id.

Although Tillery refused to sign the form documenting the incident, he did not deny the

substance of the allegations in the incident report. Tillery Dep., [Dkt. 35-1] at 160:7–167:19.  As

a result of this incident, which was a level 3 infraction, Tillery was placed on a "Final Warning

for being insubordinate[.]"  Tillery Dep., [Dkt. 35-1] Ex. 35.

On the same day he was placed on final warning, in an incident that did not result in

formal discipline, Tillery was found briefing union agents in a break room during work hours

while an aircraft was waiting to be parked.  Tillery Dep., [Dkt. 35-1] Ex. 37.  In an email

describing his follow-up conversation with Tillery about the incident, Louden advised Tillery

that "he was within his rights to speak with the agents in non-work areas when he was off the

clock to the extent he desired to do [sic] but that debating provisions of the contract in real time

with the unit managers was a non-starter and would not be allowed." [Dkt. 41-9.]  Louden also

warned Tillery that Piedmont "had no desire to experience the tumult arising from trying to

separate a union officer from the company, or losing his value to the operation as a seasoned and

competent employee, but would endure these scenarios if left with no choice." [Dkt. 41-9.]

The precipitating event for Tillery's termination was a passenger miscount on Flight 4639

on March 18, 2014, that led to a 22-minute delayed departure and to four passengers being

displaced. Tillery Dep., [Dkt. 35-1] Ex. 38.  Tillery was working the "B side" for the ground

crew assigned to that flight, meaning he was in charge of communicating with the gate agents

and other ground personnel, while another African-American employee, Sidy Bah, worked the

"A side," meaning Bah was in charge of communicating with the flight crew.  Tillery Dep.,

[Dkt. 35-1] at 176:18–21.  Consequently, Tillery's role that day was to speak "with ramp, gate,

load control, [and] other airlines who wanted to know where [Piedmont] planes [were]."  Tillery

Dep., [Dkt. 35-1] at 177:10–12.  He was also expected to provide necessary assistance to the person working the A side if that person needed a break.  Tillery Dep., [Dkt. 35-1] at 177:18–19. According to uncontradicted testimony from Bernard Kingara, an African-American who was Tillery's immediate supervisor on March 18, the B side is also responsible for "listening" to whatever the A side tells the flight crew and "automatically convey[ing] the information to whoever needs . . . the information."  Kingara Dep., [Dkt. 41-7] at 24:3–5.

It is now undisputed that Bah told the Flight 4639 flight crew that they could keep on board four passengers who were continuing on to the plane's next destination (Raleigh-Durham). Tillery Dep. [Dkt. 31-1] at 176:9–13; Bah Dep., [Dkt. 41-6] at 25:6–8; 22:11.  According to uncontradicted testimony from Kingara, as the B side worker, Tillery should have communicated that information to the gate agents.  Kingara Dep., [Dkt. 35-6] at 21:1–3 ("B side keeps track of what A side is communicating with the crew and informs the rest of the company.").  Kingara testified that the B side is supposed to use three methods to keep track of what the A side is doing: listening to what the A side says on the radio, monitoring requests from the flight crew on the radio, and checking computer print-outs.  Kingara Dep., [Dkt. 35-6] at 24:9–28:13.  Although it would be possible to miss a piece of information from any one of those three methods, "someone has to be completely off the game to miss all" three.  Kingara Dep., [Dkt. 35-6] at 27:14–28:14.  Bah's deposition testimony confirms that part of the "job requirement" was to "listen" to what the A side is doing.  [Dkt. 41-6] at 28:14–16.  It is uncontested that Tillery never passed on the information that Bah had authorized the flight crew to let the four passengers remain on board, which led the gate agents to assume that those passengers were no-shows.  As a result, the gate agents permitted four stand-by passengers to board, displacing the original four passengers.  Def. Uncontested Facts ¶ 26.  The passenger mix-up caused the flight's take-off to

be delayed 22 minutes and four passengers had to be removed from the plane. Def. Uncontested Facts at ¶¶ 25, 26. According to Kingara, when he approached Tillery about the situation, Tillery said "he was responsible for what had happened." Kingara Dep., [Dkt. 35-6] at 37:20–38:1.

The next day, both Kingara and Kingara's supervisor, Lynnnis Julien, told Piedmont management that Tillery had admitted responsibility, which management took to mean that Tillery, rather than Bah, had authorized the flight crew to allow the four passengers to stay on board. Tillery Dep., [Dkt. 35-1] at 191:18–21. Tillery maintains that he "vehemently" disputed any responsibility at the time. Tillery Dep., [Dkt. 35-1] at 181:9. Tillery claims he does not know why Kingara and Julien concluded that he had admitted some degree of fault, although he concedes that he had "no problems" with Kingara and could "agree to disagree" with Julien. Tillery Dep., [Dkt. 35-1] at 184:17, 186:4. He did not recall either Kingara or Julien ever treating him in a discriminatory fashion. Tillery Dep., [Dkt. 35-1] at 186:7. Without any corroborating evidence, Tillery speculated that Kingara was "coached" to say that Tillery had implicated himself. Tillery Dep., [Dkt. 35-1] at 184:13, 182:14. Based on the representations of Kingara and Julien,[10] on March 19, 2014, four Piedmont managers, Michelle Foose, Freddie Louden, Robert Berg, and Glen Zacek (collectively, the "decisionmakers"), made the decision to terminate Tillery's employment.[11] Pl. Disputed Facts, [Dkt. 42-2] ¶ 19. The four decisionmakers were all above 40 years old, and Louden is African-American. Def. Uncontested Facts ¶¶ 3, 4.

---

[10] Although Piedmont keeps an audio recording of all communications with the flight crew, the March 18 recording was not yet available on March 19. Zacek Dep., [Dkt. 35-8] at 15:7–9.

[11] As explained in Part II.B.4, Tillery's conduct on March 18 was a performance lapse no matter whether he personally communicated with the flight crew or simply failed to pass on Bah's communication to the gate agents.

Utilizing the union's collective bargaining agreement, Tillery challenged that decision
and a grievance hearing was held on June 26, 2014. Def. Ans. to Pl. First Int. ("1st Int."), [Dkt.
42-3] at 13. In her position as the regional and administrative manager, High conducted that
hearing. Before the hearing, she reviewed the audio recording of the communications between
Bah and the flight crew on March 18. High Dep., [Dkt. 41-2] at 32:17–19. High testified that
Tillery did not say anything in his defense during the grievance hearing, High Dep., [Dkt. 41-2]
at 36:14–16, but Tillery challenges that characterization, see Tillery Dep., [Dkt. 35-1] at 181:9.
It is undisputed that Tillery's termination was upheld at the grievance hearing. High Dep., [Dkt.
41-2] at 36:4. After Tillery was fired, Piedmont did not replace him with "one single
individual," but the next "class" of people hired, who essentially replaced him, consisted of three
black men, one of whom was born in 1968 and was, therefore, over the age of 40. Def. Ans. to
Pl. Second Int., [Dkt. 41-12] at 3.

Tillery filed his initial charge with the EEOC on June 11, 2014, marking only the box for
age discrimination. Def. Uncontested Facts ¶ 41. On December 14, 2014, the charge was
amended to include a claim for Title VII retaliation relating to the sexual harassment complaints
Tillery helped file against Chambers. Def. Uncontested Facts ¶ 42. On February 11, 2015,
Tillery filed another amended charge with the EEOC that purported to add sex, race, and color
discrimination. [Dkt. 41-13] at 1. In that communication, plaintiff also advised the EEOC that
an attorney, A.J. Dhali, was representing him and requested that all future communications,
including the right to sue letter, be directed only to counsel. [Dkt. 41-13] at 1. An EEOC
official confirmed receipt of that communication on February 18, 2011. [Dkt. 41-14] at 1.

On his EEOC forms, Tillery listed a mailing address in Bowie, Maryland. [Dkt. 41-13]
at 1. Although Tillery was not living there at the time, he admits that he used this mailing

address throughout the relevant period, and that he directed the post office to hold all his mail until he could pick it up.  Tillery Aff., [Dkt. 35-1] at 14:8–15:11.  At his deposition, Tillery stated that he did not frequently check the mail sent to the Bowie address.  [Dkt. 35-1] at 113:5–14.  The EEOC mailed the right to sue letter to both Tillery and his counsel on June 26, 2015.  Def. Uncontested Facts ¶ 45.  There is no evidence that Tillery himself ever actually received the letter, but Tillery's counsel has represented that he received it on July 3, 2015.  Pl. Opp., [Dkt. 41] at 13.  Plaintiff's complaint was filed on September 29, 2015, which is 95 days after the EEOC sent the right to sue letter but only 88 days after defense counsel purportedly received it.  See [Dkt. 1].

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009).  Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment.  Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).  Instead,

the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–25 (1986); see also Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotations omitted); see also Erwin v. United States, 591 F.3d 313, 319 (4th Cir. 2010). Failure to do so "renders all other facts immaterial" and entitles the movant to judgment as a matter of law. Rhodes, 636 F.3d at 94. The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

When determining whether a party's evidence is sufficiently credible to survive summary judgment, the court should consider when in the course of discovery a contention first appears. A party cannot manufacture a genuine issue of material fact such that "the only issue of fact is to determine which of the two conflicting versions of the [party's] testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984). Likewise, a court should not credit an

affidavit filed by a party in connection with a motion for summary judgment when the affidavit

is "conclusory" and "contradict[s the party's] sworn deposition testimony." Id. at 959.

B. Analysis

**1. Timeliness of Counts I, II, and III**

Defendant alleges that Counts I, II, and III, all of which require exhaustion of remedies

under Title VII, were filed 91 days after plaintiff constructively received the EEOC's right to sue

letter and are therefore untimely. Def. Memo. 16. Plaintiff replies that the complaint was

filed 88 days after his counsel actually received the right to sue letter, making these counts

timely. Pl. Opp. 12.

A civil action brought under Title VII must be filed within 90 days of receipt of the

EEOC's right to sue letter. 42 U.S.C. § 2000e-5(f)(1). If there is evidence of the actual date on

which the plaintiff received notice, that date controls. See Panyanouvong v. Vienna Wolftrap

Hotel, 525 F. Supp. 1166, 1168 (E.D. Va. 1986). Absent such evidence, the plaintiff will be

presumed to have received the notice three days after the EEOC sent it. Id.; Nguyen v. Inova

Alexandria Hosp., No. 98-2215, 1999 WL 556446, at *3 (4th Cir. July 30, 1999). The Fourth

Circuit has recognized that equitable tolling is available in certain circumstances. Coleman v.

Talbot Cnty. Det. Ctr., 242 Fed. App'x 72, 74 (4th Cir. 2007). In Coleman, the plaintiff moved

to a new, temporary address during the pendency of her EEOC proceeding and failed to notify

the EEOC of the change. Id. Before moving, the plaintiff directed the EEOC to forward a copy

of the right to sue letter to her counsel. Id. Although the court did not "excuse Coleman's

failure to notify the EEOC of her change of address," it nevertheless held that she was entitled to

equitable tolling until the date on which her attorney received the right to sue because "it is not at

all unreasonable for a layperson who has retained counsel to assume that all further matters will

be handled by her attorney." Id. This court has distinguished Coleman in cases where the plaintiff had actual notice that the right to sue had been issued, Collins v. Concept Solutions, L.L.C., No. 1:10-cv-1135, 2011 WL 1167199, at *4 (E.D. Va. Mar. 25, 2011), or where the plaintiff had not made an explicit request for the EEOC to forward all documents to counsel, Panyanouvong, 525 F. Supp. 2d at 799.

The EEOC mailed the right to sue letter on June 26, 2015. Def. Uncontested Facts ¶ 45. If Panyanouvong were applied, plaintiff would be presumed to have received the letter on June 29, 2015. Ninety days later would be Sunday, September 27, 2015; by operation of Fed. R. Civ. P. 6(a)(1)(C), the complaint should have been filed by Monday, September 28. Plaintiff filed on Tuesday, September 29, which would make the complaint one day late.

Although plaintiff has not cited Coleman, his claim that the limitations period should be measured from the date on which his counsel actually received the right to sue letter invokes its reasoning. Like the plaintiff in Coleman, Tillery failed to adequately check the mail at the address on file with the EEOC, but explicitly asked the EEOC to communicate with counsel. It is therefore "not at all unreasonable" for Tillery, a layperson, to have assumed that his counsel would receive the right to sue letter. Coleman, 242 Fed. App'x at 74. Although plaintiff has not submitted record evidence to support the assertion that his counsel actually received the right to sue letter on July 3, 2015, in the absence of contradictory evidence, the Court will accept that representation as true. September 29 falls 88 days after July 3, within the 90-day limitations period. On this basis, the Court finds that Counts I, II, and III were timely filed.

**2. Discriminatory Discharge (Counts I and IV)**

In Counts I and IV, plaintiff alleges that Piedmont's decision to fire him resulted from discrimination on the basis of his age and race, respectively. First Am. Compl. ¶¶ 47, 68. On the

merits of the discrimination counts, defendant contends that plaintiff cannot meet his burden of establishing either the required prima facie case or, in the alternative, that defendant's reasons for terminating him were pretextual.[12]  Def. Memo. 22–26.  To prevail on a claim of discriminatory discharge under either the ADEA or 42 U.S.C. § 1981, a plaintiff must first make out a prima facie case by showing that: (1) the plaintiff is a member of a protected class; (2) an adverse employment action occurred; (3) at the time of the adverse employment action, the plaintiff was performing duties "at a level that met the employer's legitimate expectations;" and (4) the job remained open or was filled by someone outside the plaintiff's protected class.  See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996) (assuming that this framework, announced in the Title VII context, applies in the ADEA context); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (ADEA); Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649–50 & n.1 (4th Cir. 2002) (§ 1981).  The protected class for purposes of the ADEA is persons aged 40 years or older.  Lewis v. Kmart Corp., 180 F.3d 166, 171 (4th Cir 1999).  For § 1981, the protected class is persons who share plaintiff's race.  See 42 U.S.C. § 1981.

If the plaintiff succeeds in establishing the prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Hux v. City of Newport News, 451 F.3d 311, 314–15 (4th Cir. 2006).  Because this is only a burden of production, the reasons proffered need not ultimately persuade the court.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  To overcome a defendant's non-discriminatory reasons,

---

[12] Because plaintiff does not claim to have any direct evidence of either discrimination or retaliation, the indirect method of proof is the focus of the parties' memoranda.  See Def. Memo. 22–23; Pl. Memo. 21.

the plaintiff must prove that those reasons were not the real basis for the adverse decision, but in fact pretext for discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  This third and final step "merges with the [plaintiff's] ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

That the factual premise of an employer's proffered legitimate, non-discriminatory grounds for dismissal turns out to be wrong does not suffice to show pretext.  Rather, the question is whether the employer's action was based on "reasonable reliance on the particularized facts that were before it at the time the decision was made." Tomasello v. Fairfax County, No. 15-cv-95, 2016 WL 165708, at *11 (E.D. Va. Jan. 13, 2016).  Plaintiff insists that according to Reeves, a jury question is always created where motive is in issue, see Pl. Opp. 24, but plaintiff misreads that case.  Reeves explicitly declined to create such a rule, and confirmed that the essential inquiry is whether the totality of the circumstances surrounding a plaintiff's discharge debunks the proffered legitimate basis for action.  See Reeves, 530 U.S. at 147.

As to Count I, which alleges age discrimination, there is no dispute that plaintiff has satisfied the first two prongs of the prima facie case: plaintiff was 65 years old when Piedmont subjected him to the adverse employment action of being fired.  With respect to the third element, although there is significant evidence of deficient performance in that Tillery was under a final warning concerning his disciplinary record, drawing all inferences in his favor, there is sufficient evidence to conclude that he was satisfying his employer's expectations.  For example, an email Louden sent on February 6, 2014, a little over a month before Tillery was fired, called him a "seasoned and competent employee." [Dkt. 41-10.]  Additionally, Howard averred that he was "surprised" that Tillery was terminated because of the Flight 4639 delay, Howard Aff.,

[Dkt. 41-3] ¶ 11, and Gordon averred that "to the best of [his] knowledge, never was an employee terminated for flight delays" while he worked for Piedmont, Gordon Aff., [Dkt. 41-4] ¶ 12. Even Kingara admitted that he would not have fired Tillery solely for his role in the delay. Kingara Dep., [Dkt. 41-7] at 69:17. Tillery also satisfies the fourth element because only one of the three employees who replaced him fell within the ADEA protected class, and that person was nearly 20 years younger than Tillery. See Def. Ans. to Pl. Second Int., [Dkt. 41-12] at 3. Consequently, plaintiff has presented sufficient evidence to make out a prima facie case of age discrimination.

Because defendant has articulated a legitimate, non-discriminatory basis for terminating plaintiff, the prima facie case is not the end of the inquiry. According to Piedmont, plaintiff was fired because of his "performance lapse while on a final warning." Def. Rep. 10. Under the McDonnell Douglas burden shifting framework, plaintiff must therefore show that the termination decision was pretext, and it is here that Tillery's age discrimination case founders. Even when viewed as favorably as possible for Tillery, the evidence in this record does not support a finding that defendant's reason for firing plaintiff was a pretext or that plaintiff's age or race played any part in the decision. Although this fact is not dispositive, it is noteworthy that all four of the people who had some input in the decision to fire Tillery, and High, who denied plaintiff's grievance, fall within the ADEA's protected age range. Def. Uncontested Facts ¶¶ 3, 4; High Dep. [Dkt. 41-2] at 6:3. Moreover, the bulk of Tillery's evidence of age-based commentary implicates Jones, but there is no evidence in this record that she played any part in the termination decision. Among the five who had a role, only High is alleged to have referred to Tillery's age in a derogatory fashion. See Howard Aff., [Dkt. 41-3] ¶ 4. According to Howard's affidavit, High said Tillery "is old age [sic], he is an old grandpa." A single comment,

made at best several months before she considered plaintiff's grievance is not sufficient to permit a reasonable jury to conclude that the decision to fire Tillery was pretext. Consequently, defendant is entitled to judgment as a matter of law on Count I.

As to Count IV, which alleges race discrimination under § 1981, Tillery cannot satisfy the fourth element of the prima facie case because all three of the men who replaced him were African-American. Def. Ans. to Pl. Second Int., [Dkt. 41-12] at 3. Because he cannot show that the position remained open or was filled by someone outside his protected class, Piedmont is entitled to summary judgment on Count IV as well.

### 3. Hostile Work Environment (Counts II and V)

Defendant contends that plaintiff has failed to produce evidence sufficient to support a finding of a hostile work environment under either the ADEA or § 1981. Def. Memo. 18. Because the legal threshold for establishing a hostile work environment is identical under the two statutes, they will be treated together. See Baqir v. Principi, 434 F.3d 733, 745–46 (4th Cir. 2006).

To prevail on an ADEA or § 1981 hostile work environment claim, a plaintiff must establish four elements: (1) the plaintiff experienced unwelcome conduct; (2) based on the plaintiff's age or race; (3) the conduct was "sufficiently severe or pervasive" to create an abusive work environment; "and (4) there is some basis for imposing liability on the employer." Baqir, 434 F.3d at 745–46. In other words, the work environment must be both subjectively unwelcome and objectively hostile. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993).

When assessing objective hostility, a court considers the totality of the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it

unreasonably interferes with an employee's work performance." Smith v. First Union Nat'l
Bank, 202 F.3d 234, 242 (4th Cir. 2000).  The focus must be on the plaintiff's personal
experience, not second-hand comments.  See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d
180, 190 (4th Cir. 2004).  Comments made outside the plaintiff's presence cannot independently
sustain a hostile work environment claim.  Dawson v. Rumsfeld, No. 1:05-cv-1270, 2006 WL
325867, at *4 (E.D. Va. Feb. 8, 2006).  Furthermore, "minor incidents, even in the aggregate, do
not merit relief."  Mayo v. Smith, No. 1:15-cv-0029, 2016 WL 2894871, at *8 (E.D. Va. May 16,
2016); see also Reed v. Neopost USA, Inc., 701 F.3d 434, 439, 443 (5th Cir. 2012) (affirming
summary judgment under state anti-discrimination statute analogous to the ADEA where
coworkers called plaintiff "names like 'old man,' 'old fart,' 'pops,' and 'grandpa'").

     The evidence in this record is insufficient to demonstrate an objectively hostile work
environment on the basis of age or race.  With respect to age, most of plaintiff's evidence
concerns comments made outside his presence, but repeated to him by others.  Those comments
include Howard's description of a manager's meeting in "Winter 2013" when Jones, High,
Chambers,[13] and others mockingly referred to Tillery as "old age" and "grandpa."  [Dkt. 41-3]
¶ 4.  Tillery does not allege that he was even aware of these statements until discovery during
this lawsuit.  Those statements therefore do not bolster Tillery's hostile work environment claim.
See Honor, 383 F.3d at 190.  The only evidence of age-related comments made in Tillery's
presence is his testimony that Jones referred to him as "granddad" or "grandpa" and performed a
dance associated with the elderly "Granddad" character from The Boondocks on a regular, even
daily, basis.  Tillery Dep., [Dkt. 35-1] at 215:6–218:21.  Tillery admits that although he did not
like these references, he did not necessarily find them offensive and that his "feelings were not

---

[13] According to Tillery, Chambers continued to work with another entity at DCA even after
Piedmont fired him in August 2012.  Tillery Dep., [Dkt. 41-1] at 105:11–13.

hurt." [Dkt. 35-1] at 218:17–219:4. Jones' references to Granddad are the kind of minor

conduct that, "even in the aggregate," does not amount to an objectively hostile work

environment, see Dawson, 2006 WL 325867, at *4, particularly in light of Tillery's admission

that he did not necessarily find the conduct offensive. That admission reveals that the conduct

did not unreasonably interfere with his job performance, let alone create an abusive

environment.[14] See Baqir, 434 F.3d at 746. Defendant is accordingly entitled to judgment as a

matter of law on Count II.

On the § 1981 hostile work environment claim, Tillery has alleged only a single racially

offensive comment. That comment was not made in his presence, and plaintiff's versions of that

comment have changed from the First Amended Complaint to the more invidious version that

appears in his last-minute affidavit. Following Dawson, comments made exclusively outside a

plaintiff's presence cannot sustain a finding of "severe and pervasive" abuse. 2006 WL 325867,

at *4. Using either version of the statement, defendant is entitled to summary judgment on

Count V.[15]

Defendant has also raised the defense established in Faragher v. City of Boca Raton, 524

U.S. 775, 807–08 (1998), which is available when a plaintiff unreasonably fails to avail himself

of a defendant's corrective policies and proceudres. Because plaintiff's failure to establish the

prima facie case entitles the defendant to summary judgment, the Court need not address those

arguments. See Rhodes, 636 F.3d at 94.

---

[14] In his affidavit filed along with his opposition to summary judgment, Tillery claimed for the first time that Jones' actions affected "his concentration at work." Dkt. 41-15 ¶ 24. As that claim contradicts plaintiff's deposition testimony, it will not be credited. See Barwick, 736 F.2d at 959.

[15] Plaintiff's claims of a racially hostile work environment are also seriously undermined by the composition of Piedmont's workforce at DCA, where 81% of all employees and 74% of management are African-American. See Foose Aff., [Dkt. 35-9] ¶ 4.

### 4. Retaliation (Counts III and VI)

In Counts III and VI, plaintiff alleges that defendant's decision to fire him was retaliatory in violation of Title VII and § 1981. First Am. Compl. ¶¶ 61, 80. Defendant argues that there is no causal connection between plaintiff's Title VII protected activity and the decision to terminate him, and that plaintiff has not even alleged protected § 1981 activity. Def. Memo. 26.

To succeed on a retaliation claim, a plaintiff must first make out a prima facie case by satisfying three elements: (1) he engaged in a protected activity known to the decisionmaker; (2) he suffered an adverse employment action; and (3) there is a causal relationship between the protected activity and the adverse employment action. Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015). In a Title VII retaliation claim, causation must be shown "according to traditional principals of but-for causation." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013). If the plaintiff relies solely on the proximity in time between the protected activity and the adverse action to establish causation, a lengthy gap in time will ordinarily defeat such an inference. See Clark Cnty. School Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation."). Where there is an intervening period of time between the protected activity and the adverse employment action, a plaintiff can rely on a decisionmaker's "continuing retaliatory conduct and animus" to supplement the evidence of causation, if that animus effectively bridges the gap in time. Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007).

Should a plaintiff make out a prima facie retaliation case, the McDonnell Douglas burden-shifting framework applies and shifts the focus to the employer's reason for taking the

adverse employment action. Foster, 787 F.3d at 246. If the defendant produces evidence of a

non-retaliatory reason for the adverse employment action, the plaintiff must show that the

asserted grounds for discharge were pretextual. Id. at 250. Evidence showing that a defendant

knowingly relied on a false account of plaintiff's conduct may justify an inference of retaliation;

however, as Tomasello held, an employer's honest reliance on inaccurate information will not

generally demonstrate that the employer's reasons were pretextual. Reeves, 530 U.S. at 147–48;

Tomasello, 2016 WL 165708 at *11.

      Tillery fails to establish a prima facie case of retaliation and also fails to establish that

Piedmont's reason for terminating his employment was pretextual. The only Title VII protected

activity that Tillery has alleged he engaged in are the three occasions in 2011 and 2012 when he

helped three women pursue sexual harassment claims against Chambers. See Tillery Dep., [Dkt.

35-1] at 248:10–249:21. At best, only two out of the four decisionmakers, Louden and Foose,

knew about that protected activity, although it is unclear when they became aware of it. What is

uncontested is that Chambers was fired in August 2012 and defendant terminated Tillery's

employment 19 months later. Under Causey, a 19-month gap in time is too long to

independently support a finding of a causal relationship between the protected activity and the

adverse employment action. Moreover, there is no evidence that either Louden or Foose ever

expressed any retaliatory animus.[16]

      The affidavits of Howard and Gordon are plaintiff's only additional evidence supporting

a causal connection, which suggest that High had a vendetta against Tillery after his participation

---

[16] In plaintiff's post-deposition affidavit, he ascribes for the first time the comment about "not
letting the union run this station" to Louden. Pl. Aff., [Dkt. 41-15] ¶ 19. That allegation, which
contradicts allegations in plaintiff's First Amended Complaint, cannot be credited, see Barwick
736 F.2d at 959, and in any event refers to union activity generally, not to activity protected by
Title VII.

in the Chambers complaints.  In his affidavit, Howard stated that High once said "Piedmont

Airlines should simply retire Mike, before the other black employees openly questioned [sic]

Piedmont airlines [sic] about their practices, their policies under the handbook and/or begin to

assert their union, employment law or civil rights against Piedmont."  Howard Aff., [Dkt. 41-3]

¶ 2.  According to Gordon, High "continually brought up" Tillery, saying he "was causing

trouble again by advocating for Piedmont employees at union grievance hearings or with the

EEOC."  Gordon Aff., [Dkt. 41-3] ¶ 14.  Gordon also stated that, in the fall 2012, High "would

routinely enquire [sic] . . . if during any flight delays Tillery had a part in or was responsible for

these flight delays," and that High never asked about any other employees.  Gordon Aff., [Dkt.

41-4] ¶¶ 8–9.

    As a threshold matter, Tillery stipulated that High was not one of the four decisionmakers

in this case.  Pl. Contested Facts ¶ 19.  Moreover, plaintiff has not alleged that High was

involved in the January 2014 disciplinary action which put Tillery on final notice that he would

be terminated if he incurred any more disciplinary infractions.  High's only role in plaintiff's

termination was to conduct the grievance hearing held three months after the termination

decision was made. Nothing in the record describes the standard by which High was to review

the decision made by Foose, Louden, Berg, and Zacek on March 19.  Additionally, there is no

clear evidence of how much time elapsed between when High made those alleged sporadic

statements and when she made the decision to deny Tillery's grievance, rendering those

comments insufficient evidence to support a claim of continuing retaliatory animus under

Lettieri.[17]

---

[17] The paragraph outlining these comments begins "[i]n a later or subsequent managers meeting," without  clearly identifying the antecedent meeting.  See Howard Aff., [Dkt. 41-3] ¶ 6.  Although an earlier paragraph refers to a managers meeting "sometime in Winter 2013," Howard Aff.,

Tillery has argued that because High, unlike Zacek, Berg, Foose, and Louden, listened to the audio recording of the communications before she denied his grievance, that decision was knowingly based on false information and therefore allows for an inference of retaliation under Reeves. Pl. Opp. 30. In making this argument, Tillery assumes that High recognized that Bah, rather than Tillery, told the flight crew to keep the four passengers on board and that if Bah made that statement then Tillery is completely exonerated. Both premises are flawed. Although High has admitted that she listened to the recording, there is no evidence in the record that she recognized Bah to be the one who authorized the four passengers to stay on board. See High Dep., [Dkt. 41-2] at 32:17–19. More importantly, the dispute over who actually spoke to the flight crew is a red herring. Piedmont has never argued that the alleged communication with the flight crew was the sole basis for terminating plaintiff. Rather, according to Piedmont, plaintiff's dismissal was based on his performance lapse while on final disciplinary warning. Def. Reply 10. As Kingara testified, even if Tillery was not the person who communicated the authorization to the flight crew, it was plaintiff's responsibility on the B side that day to pass that information along to the gate agents. Kingara Dep., [Dkt. 35-6] at 27:14–28:14. Kingara clearly testified that Tillery's failure to do so was a performance lapse and Tillery has presented no evidence contradicting that statement. Kingara Dep., [Dkt. 35-6] at 27:14–28:14. In fact, Tillery has admitted that what happened on March 18 was a "system wide failure." Pl. Disputed Facts 7. His role in that "system wide failure" precludes him from showing, as Nassar requires, that he would not have been fired "but for" the protected activity. 133 S. Ct. at 2533.[18] Under

_____

[Dkt. 41-3] ¶ 4, these paragraphs do not allege the timing of the statements with a sufficient degree of clarity.

[18] This conclusion is not affected by Kingara's testimony that he would not have fired Tillery for the miscount, or Gordon and Howard's statements that they were surprised by his termination and did not know of anyone having been terminated for a similar offense, see [Dkt. 41-7]

Piedmont's progressive discipline procedure, plaintiff's March 18 performance lapse in combination with his disciplinary record over the preceding 12 months fully justified defendant's decision to terminate Tillery's employment. Foose Aff., [Dkt. 35-9] ¶ 11. Consequently, defendant is entitled to summary judgment on the Title VII retaliation claim.[19]

To make out a prima facie case for his § 1981 retaliation claim, plaintiff must allege that he participated in a protected activity related to racial discrimination. Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543 (4th Cir. 2003). When asked during his deposition whether he ever complained to any manager about racial discrimination in the workplace, Tillery's answer was "I would say—I would say yes. But then it would be specific to individuals, individuals. Like it would be specific to what an individual had told me. And if more than one person told me, I would say we have an incidence of where we need to—we need to put a stop to it or curtail it." [Dkt. 41-1] at 228:1–9. Referring to a conversation with Louden, he continued, "We—we talked about race and the fact that we were firing quite a few African-descent individuals, and we were hiring quite a few. So it would stand to reason, but—since there were more of them, that we were—and there was more of them going out the door. So we had a conversation about that. We had a conversation about race." Dkt. 41-1 at 229:4–13. Tillery remembers no specific details about these conversations, including about whom he might have been speaking, when or where these conversations took place, or what, if anything, Louden said in response. See [Dkt. 41-1] at 228:1–229:22. That one conversation is the only protected § 1981 activity in the record, and plaintiff's recollection is so vague and lacking in detail that it

---

at 69:17; [Dkt. 41-3] ¶ 11; [Dkt. 41-4] ¶¶ 10–12, because there is no evidence that Kingara, Gordon, or Howard had any information about Tillery's disciplinary record, including that in January 2014 he was given a final warning.

[19] For the same reasons, Tillery would not be able to show that defendant's rationale for his dismissal was pretext. Summary judgment would therefore be warranted on that basis as well.

does not satisfy the requirement that the plaintiff come forward with more than merely "metaphysical doubt" or conclusory allegations. <u>Matsushita</u>, 475 U.S. at 586–87. Even if plaintiff were able to establish a <u>prima facie</u> case, for the reasons previously discussed, plaintiff has failed to present sufficient evidence to establish that defendant's explanation for the termination decision was pretextual. Defendant is therefore entitled to summary judgment on Count VI as well.

### III. CONCLUSION

For the reasons articulated above, defendant's Motion for Summary Judgment will be granted by an appropriate order to be issued with this Memorandum Opinion.

Entered this 22 day of September, 2016.

Alexandria, Virginia.

/s/

Leonie M. Brinkema
United States District Judge